**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

ALK:DR/DJM/MND
F. #2025R00508

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

September 8, 2026

By ECF

The Honorable Joseph A. Marutollo
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Haile Cummings
Docket No. 25-MJ-262 (CHK)

Dear Judge Marutollo:

The government respectfully submits this letter in support of its application for the entry of an order of detention pending trial as to the defendant Haile Cummings. Cummings, also known as "Ruga" and "Ruga Gz," is a member of the Folk Nation Gangster Disciples ("GD"), a violent street gang based in Brooklyn, New York. As alleged in the complaint (the "Complaint"), on August 17, 2025, the defendant engaged in a violent shooting at Taste of the City Lounge in Brooklyn, New York (the "August 17 Shooting" or the "Shooting"). As a result of the Shooting, in which members and associates of GD and a rival gang, the 5-9 Brims, fired over forty shots in a crowded bar, three individuals were murdered and an additional ten individuals were shot and injured.[1]

For the reasons explained below, including the defendant's brazen and violent conduct, fugitive status for the past year and criminal history, the defendant is both a flight risk and a danger to the community, and no combination of conditions can secure his appearance at trial and the safety of the community.

[1] The Complaint also charged two members and associates of the 5-9 Brims, Timothy Spence and Elijah Roy, for their involvement in the Shooting. Both Spence and Roy were detained pending trial.

I. The Defendant's Crimes

A. Background

The government proffers the following facts concerning the offense conduct that is relevant to the defendant in this case. See United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (holding that the government may proceed by proffer in a detention hearing); United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995) (same); United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986) (same).

GD has been a significant contributor to gun violence in Brooklyn for more than a decade, committing dozens of shootings, particularly drive-by shootings, in rival gang neighborhoods such as Canarsie, Brownsville and Prospect Park South. GD operates in Brooklyn through several neighborhood-based subgroups, or "sets," including the "Six Trey" set (also known as "63" or "6-Trey"), which is based primarily in the vicinity of the Ebbets Field housing complex near the Crown Heights neighborhood of Brooklyn.

Members and associates of GD have committed acts of violence on behalf of the gang, such as shootings and other acts involving murder and assault, drug trafficking and fraud, among other crimes. In GD, participation in criminal activity by a member, especially violence directed at rival gang members, increases the respect accorded to the member and could result in promotion to a leadership position. Threats of violence often become acts of violence with members and associates engaging in "drills" in which they drive, often in a convoy of several cars, to rival gang territory in Brooklyn and indiscriminately shoot at groups of young people. Moreover, the gang glorifies gun violence including through its use of social media, in which members and associates post content and videos showing them with firearms, pantomiming firearms, and antagonizing rivals through online taunts and threats.[2]

[2] Numerous members and associates of GD have been convicted of or charged with serious violent crimes in this District over the last several years. See, e.g., United States v. Waddell, et al., No. 24-CR-351 (S-2) (LDH) (nine GD defendants charged with racketeering offenses, including murder and a gang-related drive-by-shooting on Father's Day in 2022); United States v. Britton, No. 23-CR-406 (LDH) (GD leader charged with false statements and obstruction); United States v. Zeigler, No. 23-CR-114 (MKB) (GD member charged with firearm possession in connection with a shooting); United States v. Apollon, No. 21-CR-636 (DG) (GD member charged with robbery of vehicles from parking garage where parking attendant was permanently injured); United States v. Cummings, No. 21-CR-406 (CBA) (GD associate charged with possessing multiple firearms on multiple separate occasions); United States v. Powell, No. 21-CR-205 (LDH) (GD member charged with firearm possession in connection with a shooting); United States v. Agoro, No. 21-CR-166 (WFK) (relating to a March 14, 2021 use of threatened use of force in furtherance of a plan to commit extortion); United States v. Brown, No. 20-CR-293 (WFK) (eleven GD defendants charged with racketeering offenses for seven gang-related shootings in 2020).

In the present Complaint, the defendant, who was previously convicted of felonies including racketeering, is charged with illegally possessing ammunition in violation of 18 U.S.C. § 922(g)(1), for his participation in the violent shooting at the Taste of the City Lounge discussed herein.

B. The August 17, 2025 Shooting at Taste of the City Lounge

As set forth in the Complaint and as depicted on video surveillance, the defendant participated in the August 17 Shooting at Taste of the City Lounge, located at 903 Franklin Avenue in Brooklyn, New York (the "Lounge").

Still images taken from video surveillance footage depicts members and associates of both GD and the 5-9 Brims in the vicinity of the Lounge before the August 17 Shooting. For example, at approximately 1:30 a.m., the defendant (circled in orange below and throughout) was outside the Lounge with three other individuals known to be members and associates of GD.



At approximately 2:31 a.m., Timothy Spence (circled in blue below and throughout) and Elijah Roy (circled in yellow below and throughout) joined Marvin St. Louis, another associate of the 5-9 Brims who was killed in the course of the Shooting, and a group of 5-9 Brims associates outside of the Lounge.








The group of GDs and 5-9 Brims eventually entered the Lounge. At approximately 3:15 a.m., St. Louis made a small-b hand sign, signifying his association with the 5-9 Brims, and then made a GD hand sign, which is a derogatory gesture to GD when used by a rival gang member. Jamel Childs—one of the victims of the August 17 Shooting— who appeared to have a firearm in his pocket, then approached St. Louis in the back of the bar. The two individuals appeared to have a discussion before Childs returned to the middle of the bar and the group of GD associates.

As further detailed in the Complaint, and in the video attached to this memorandum as Exhibit A which depicts the shooting in full, at approximately 3:22 a.m., St. Louis, Spence and Roy, as well as others, stood together at the back of the bar, appearing to be in the middle of a discussion. Spence, Roy, and St. Louis then walked back towards the entrance of the Lounge. St. Louis bolted through the crowd toward Childs and the other GD members and associates. St. Louis then began to fire towards Childs and the defendant returned fire. As seen in the still-image below, the defendant, who was standing near Childs, then began shooting towards St. Louis.



Spence and Roy, who were on their way to the bar's exit when the shooting started and were thereby standing closer to the bar's exit, then proceeded to shoot back towards where Childs and the defendant were standing.

At approximately 3:23 a.m., Spence (on the left-hand side below), followed by defendant Roy (on the right-hand side below), stumbled out of the front door of the Lounge holding firearms.





The defendant left the bar at approximately 3:25 a.m.



In total, St. Louis, Childs, and a third individual were shot and killed as a result of the shooting. An additional ten individuals were shot and injured.

C. <u>The Defendant's Membership in and Association with the GD</u>

The defendant also known as "Ruga" and "Ruga Gz," is a longtime member of GD. On July 9, 2014, the defendant pleaded guilty to racketeering, in violation of 18 U.S.C. § 1962(c), and admitted to his participation in a conspiracy to murder a member of a rival gang, the President Street Crew (as alleged in Racketeering Act 5), and the conspiracy to rob a jewelry store in Hackensack, New Jersey (as alleged in Racketeering Act 8). <u>See</u> <u>United States v. Haile Cummings</u>, No. 11-CR-303 (NGG). During a trial of his co-defendants, the defendant was identified as a member of GD, specifically, the Six Tre Outlaw Gangsta Disciples Folk Nation set ("Six Tre Folk Nation" or "Six Tre").[3] As noted above, this set operated (and continues to operate)[4] in the Ebbets Field housing projects near the Crown Heights area of Brooklyn. As elicited at the trial, the defendant went by the street name "Ruga" or "Ruger" because he was known for shooting guns. The gang also stored 5-6 guns in the defendant's apartment for use by

---

[3] "Six Tre" is an alternative spelling of "Six Trey."

[4] As relevant herein, on November 18, 2022, a trial jury sitting in the Eastern District of New York convicted four members of GD of various crimes, including violent crimes in-aid-of racketeering stemming from four drive-by shootings variously committed by them and other members of GD in November 2020 (the "GD Trial"). <u>See</u> <u>United States v. Agoro et al.</u>, No. 20-CR-293 (WFK). During the GD Trial, a cooperating witness testified that the "6-Trey" set exists in Brooklyn, New York, particularly in the vicinity of Ebbets Field, Brooklyn.

gang members whenever they were needed. This included retrieving guns from the defendant's apartment in connection with a conspiracy to murder members of the rival President Street Crew.

The defendant also participated in a conspiracy to rob jewelry stores with other gang members. Between 2009 and 2010, members of the gang committed several smash-and-grab robberies of high-end jewelry stores located in New York, New Jersey and Connecticut. The defendant participated with a co-defendant in the robbery of a jewelry store in Hackensack, New Jersey, as well as a conspiracy to rob a jewelry store in Manhattan.

A review of the defendant's social media indicates that he has publicly displayed his affiliation with GD following his term of incarceration. Specifically, the defendant uses a Facebook account with the username "RuGa.Gzz." Members of GD commonly use the term "G" or "Gz" to signify their association with the gang. Relatedly, posts from the defendant's Facebook account include the phrases "Happy GDay" and "Straight G'z." An example is depicted below:




Additional posts on the defendant's Facebook account include terminology known to be associated with the defendant's set of GD—Six Trey from Ebbets Field—including the phrase "LOTS," which stands for "Leaders of the Six." As another example, on June 3, 2020, the following was posted on the defendant's Facebook account: "Happy 63 Day to My Dawgz From the Lots." It is common for members of GD to celebrate the day of the year associated with the numbers of their set, with June 3 or 6/3, signifying Six Trey (63). Posts from the defendant's Facebook account also include emojis, such as the black-heart, twirl and trident emoji, which are used by members and associates of GD to signify their association with GD. A photograph of the defendant and the twirl and trident emoji is included below:




The defendant has also posted pictures on his Facebook account with individuals who are making hand signs, specifically "dropping woo," "the rake" and a Six Trey specific hand-sign in the shape of a six and a three, which are hand-signs used by members and associates of GD to signify their association with the gang. Additionally, the individuals in the below photograph posted on February 27, 2018 are known to be members or associates of GD, including two individuals who were present with the defendant and wounded during the August 17 Shooting.




As described above, on the night of the August 17 Shooting, the defendant was inside and outside the Lounge with multiple members and associates of GD, which shows his recent affiliation and commission of violent crimes with the gang.

II. The Defendant's Criminal History and Additional Relevant Information

As described above, on July 9, 2014, the defendant pleaded guilty to racketeering, in violation of 18 U.S.C. § 1962(c). The defendant was an active participant in a violent criminal enterprise that terrorized the residents of the Ebbets Field housing projects. He participated in the frequent acts of violence with the gang, which victimized both rivals and innocent bystanders alike. The murder conspiracy and the robbery to which the defendant admitted plainly demonstrated the grave danger to the community created by the Six Tre Folk Nation. He was sentenced to 54 months' imprisonment and three years' supervised release for this conduct.

On February 11, 2016, the defendant pleaded guilty to Criminal Possession of a Controlled Substance in the Seventh Degree, in violation of N.Y. Penal Law § 220.03. He was sentenced to time served and his license was suspended for six months.

Since the Complaint and arrest warrant were issued, if not since the day of the Shooting, the defendant has been on the run. Members of the U.S. Marshals Service and Special Agents with the Federal Bureau of Investigation have been attempting to apprehend the defendant, including by contacting his known associates, visiting and speaking with individuals at his known residences, and monitoring the defendant's phone and social media activity, among other methods.

On September 7, 2026, the defendant was arrested outside of Ebbets Field. Based on a report from the New York City Police Department ("NYPD"), officers observed the defendant drinking an alcoholic beverage inside a public park. When the officers approached him, the defendant fled and hid underneath a vehicle. After being apprehended, the defendant provided the officers with a fake name and date of birth. Ultimately, the defendant's identity was confirmed through his fingerprints, and he was arrested pursuant to the outstanding warrant in the above-reference case. The defendant has since identified himself Haile Cummings.

III. Legal Standard

The court "shall order" a defendant detained if it finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). The government bears the burden of persuading the court by a preponderance of the evidence that the defendant is a flight risk or by clear and convincing evidence that the defendant is a danger to the community. United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001).

As noted above, the government may proceed by proffer to establish facts relevant to a detention determination. Ferranti, 66 F.3d at 541. Furthermore, "[t]he rules of evidence do not apply in a detention hearing." Id. at 542. As the Second Circuit has explained:

> [I]n the pre-trial context, few detention hearings involve live testimony or cross examination. Most proceed on proffers. See United States v. LaFontaine, 210 F.3d 125, 131 (2d Cir. 2000). This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery." United States v. Acevedo-Ramos, 755 F.2d 203, 206 (1st Cir. 1985) (Breyer, J.) (quoted approvingly

> in LaFontaine, 210 F.3d at 131). Indeed, § 3142(f)(2)(B) expressly states that the Federal Rules of Evidence do not apply at bail hearings; thus, courts often base detention decisions on hearsay evidence. Id.

United States v. Abuhamra, 389 F.3d 309, 320 n.7 (2d Cir. 2004).

Whether detention is sought on the basis of flight or dangerousness, the Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged, "including whether the offense is a crime of violence . . . or involves a . . . firearm"; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including "whether, at the time of the current offense or arrest, the person was on probation [or] on parole"; and (4) the seriousness of the danger posed by the defendant's release. See 18 U.S.C. § 3142(g). Specifically, in evaluating dangerousness, courts consider not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).

## IV. Argument

### A. The Defendant is Eligible for Detention Under Section 3142(f)

The defendant is charged with a violation of 18 U.S.C. § 922(g), which the Second Circuit has held is a "crime of violence" for purposes of 18 U.S.C. § 3143(f)(1)(A). See United States v. Watkins, 940 F.3d 152, 163 (2d Cir. 2019) ("It has long been the law of our Circuit that possession of a firearm is unequivocally a crime of violence for purposes of § 3142(f)(1)(A). Our Court's reasoning in arriving at this conclusion applies with equal force to the crime of possession of ammunition by a convicted felon.").

### B. Detention is Warranted

No bail package can protect the community from the danger posed by the defendant or mitigate the risk that he will flee. Each of the four factors set forth in Section 3142(g) militate in favor of his pretrial detention.

First, the defendant is charged with a crime of violence that "involves a . . . firearm." 18 U.S.C. § 3142(g)(1). The offense conduct here involved the defendant firing multiple rounds at rival gang members in a crowded nightclub during the August 17 Shooting. As a result of this incredibly violent and senseless conduct, three people were murdered and an additional ten individuals were shot and injured. This wanton violence demonstrates the severe danger the defendant poses to the community. See United States v. Williams, No. 20-CR-293 (WFK), 2020 WL 4719982, at *2 (E.D.N.Y. Aug. 13, 2020) (holding magistrate judge erred in releasing on bail defendant who possessed a firearm in connection with an allegedly gang-motivated shooting); see also United States v. Destine, No. 20-CR-293 (WFK), 2022 WL 2181453, at *2-3 (E.D.N.Y. June 16, 2022) (finding nature of offense weighed against release for GD member charged with driving a decoy car during a shooting).

Second, the weight of the evidence against the defendant is overwhelming. See United States v. Zhang, 55 F.4th 141, 151 (2d Cir. 2022) (where the evidence of a defendant's guilt is strong, "it follows that the defendant faces an elevated risk of conviction (and of the attendant punishment) and therefore may present an elevated risk of flight"). As described above, and as seen in the video attached as Exhibit A, law enforcement collected surveillance videos that clearly depict the defendant in the vicinity of the Lounge and inside the Lounge before the August 17 Shooting. The video footage also captures the defendant and other individuals firing multiple rounds not only at members and associates of the 5-9 Brims but in a crowded bar with dozens of people within feet of his intended targets.

Based on the charges in the Complaint alone, the defendant currently faces a significant maximum sentence: 15 years' incarceration. The Shooting, however, is still under investigation, including for charges of discharging a firearm during a crime of violence, which carries a mandatory minimum sentence of ten years, and VICAR murder, which carries a mandatory life sentence. The likelihood of a lengthy term of imprisonment for the defendant gives him a strong incentive to flee and greatly minimizes any risk that pre-trial detention would result in an over-served sentence. See Williams, 2020 WL 4719982, at *2 (Guidelines range of "92 to 115 months' imprisonment" gave defendant "a strong incentive to flee"); United States v. Bruno, 89 F. Supp. 3d 425, 431 (E.D.N.Y. 2015) ("When evidence of a defendant's guilt is strong, and when the sentence of imprisonment upon conviction is likely to be long a defendant has stronger motives to flee."). See, e.g., United States v. Scali, 738 F. App'x 32, 33 (2d Cir. 2018) ("The court reasonably determined that [defendant's] Guidelines range of 87-108 months' imprisonment was significant enough to provide an incentive to flee").

That the defendant poses a risk of flight is proven by his conduct immediately after the Shooting. After the Shooting, which was widely-publicized,[5] the defendant took steps to avoid apprehension. Specifically, after the Shooting the defendant abandoned his known residences and the phone he was using. He also began using VPN technology to obscure his location when he was logging in to his Apple accounts. Despite numerous efforts and conversations with the defendant's family and known associates, the defendant has successfully evaded law enforcement for over a year.[6] His intent to flee from his crimes is further reflected by the defendant's conduct yesterday, the day of his arrest, in which the defendant not only fled from NYPD officers, but provided a false name and date of birth to avoid detection and apprehension.

Third, the defendant's history and characteristics weigh heavily in favor of detention. The defendant is associated with GD, a violent street gang. As noted above, the defendant previously pleaded guilty to murder conspiracy as part of his association with GD. The defendant's actions since the time of his previous detention show that he was not deterred

---

[5] See, e.g., Mascarenhas, Lauren, Police searching for multiple shooters who killed 3 and wounded 9 after dispute at a Brooklyn lounge, CNN (Aug. 17, 2025), https://www.cnn.com/2025/08/17/us/brooklyn-lounge-shooting-killed-three-police-searching.

[6] Notably, the government was contacted by an attorney weeks ago about a potential surrender that never came to fruition.

from his previous conviction, given his continued association with members of GD, access to and possession of firearms and willingness to use those firearms in furtherance of the gang. This history, when coupled with the defendant's flight since his commission of the August 17 Shooting, demonstrates that the defendants pose an unacceptable risk to the community and risk of nonappearance in Court if he were to be released.

Fourth, the risk of further violence and flight by the defendant is severe. Courts have consistently held that where a defendant is associated with a violent criminal organization, no conditions—even stringent conditions of home confinement—are sufficient to protect the community. See United States v. Irizzary, No. 17-CR-283 (LAP), 2020 WL 1705424, at *3 (S.D.N.Y. Apr. 8, 2020) ("Even under normal conditions, electronic monitoring does not suffice to restrain violent criminals who, like [the defendant], are members of organized gangs."); United States v. Choudhry, 941 F. Supp. 2d 347, 359 (E.D.N.Y. 2013) ("It is well established that home detention and electronic monitoring may be insufficient to protect the community against dangerous individuals, particularly where those individuals have the ability to command others to do their bidding."); United States v. Gotti, 219 F. Supp. 2d 296, 299 (E.D.N.Y.) ("In circumstances where the government has demonstrated that a defendant is a leader of an organized crime family, the Second Circuit has uniformly held that the defendant is dangerous because inherent in the leadership position is the supervision of criminal activity that cannot be curtailed by any condition or combination of conditions of release."), aff'd sub nom. United States v. Ciccone, 312 F.3d 535 (2d Cir. 2002).[7] The defendant has not been deterred by his prior custodial term or prohibitions based on his conviction and instead not only possessed, but discharged a firearm in a crowded bar surrounded by dozens of innocent bystanders. The danger this defendant poses to the community is not hypothetical. That risk is real, as evidenced by his and others' actions, which caused three people to die and ten more to be injured.

The § 3142(g) factors each compel detention in this case, demonstrating that the defendant cannot be released without risking the safety of the community and the likelihood that he will not return to court as required. The defendant should therefore be detained.

## V. Conclusion

For the reasons set forth above, the government respectfully submits that no condition or combination of conditions will properly assure the safety of the community or the

---

[7] See also United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993) ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology"); accord United States v. Brennerman, 705 F. App'x 13, 16 (2d Cir. 2017); United States v. Dono, 275 F. App'x 35, 37 (2d Cir. 2008); United States v. Kelly, No. 19-CR-286 (AMD), 2020 WL 2528922, at *3 (E.D.N.Y. May 15, 2020) ("Nor are the defendant's proposed measures—that he be kept on home confinement and monitored by pretrial services—sufficient to eliminate the danger to the community.").

defendant's return to court if the defendant is released on bail, and therefore requests that the Court order that the defendant be detained.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By: /s/ Dana Rehnquist
Dana Rehnquist
Daniel J. Marcus
Molly N. Delaney
Assistant U.S. Attorneys
(718) 254-7000

cc: Clerk of the Court (CHK) (by ECF)
Counsel of Record (by ECF)